UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES                                                                    Plaintiff

v.                                                                Criminal Action No. 3:18-cr-46

CHARLES CATER                                                                    Defendant

* * * * *

## MEMORANDUM OPINION & ORDER

Charles Cater ("Cater") moves to suppress evidence.  [DE 161].  The United States filed a response and a corresponding motion to exceed the page limitation for their response.  [DE 188, 189].  Cater replied *pro se* and by counsel.  [DE 191, 192].  The Court conducted an evidentiary hearing.  [DE 183].  This matter is ripe.  For the reasons below, the Court **GRANTS** the United States' motion for leave to exceed page limitations  [DE 188] and **GRANTS IN PART** Cater's Motion to Suppress Evidence.  [DE 161].

## I.      BACKGROUND

### A.  Investigating the Drug Trafficking Organization ("DTO")

In November 2016, the Drug Enforcement Administration's ("DEA") Louisville Field Division began investigating a DTO "responsible for the importation and distribution of kilogram quantities of crystal methamphetamine, heroin, cocaine and marijuana into Louisville."  [DE 140-2 at 489].  Javier Rodriquez ("Rodriguez"), the alleged head of the DTO, negotiated "the price and delivery of large quantities of narcotics with multiple sources of supply."  *Id.*  When the narcotics arrived in Louisville, Dwain Castle ("Castle"), another alleged member of the DTO, "distribute[d] the narcotics to lower level traffickers in Louisville."  *Id.*  Rodriquez and Castle allegedly stored the narcotics at two locations: 7703 Dominique Drive and 6420 Labor Lane.  *Id.*

On January 16, 2018,[1] the DEA intercepted phone calls between Rodriguez and Vincente Ramirez ("Ramirez").  *Id.* at 490.  Ramirez and Rodriguez allegedly brokered a deal to sell a kilogram of heroin to Justin Smith ("Smith") for $70,000.  *Id.*  When they met, Smith and Ramirez robbed the DTO.  *Id.*  Over the next few days, Rodriguez made a series of phone calls in which he allegedly revealed that he intended to kill Smith and Ramirez for stealing the kilogram of heroin. *Id.* at 490-92.

Four days after the robbery, police officers "responded to a report of a shooting at 4903 Poplar Level Road on the lot of the Valero Gas Station."  [DE 140-3 at 500].  When they arrived, they found Ramirez dead in his car, a handgun in his pocket.  *Id.*  Detective Jason Clopton ("Clopton") of the Louisville Metro Police Department investigated Ramirez's murder.  *Id.*  Based on his investigation and information received from a confidential informant, Clopton developed "Tookie" as a suspect in Ramirez's murder.  *Id.*  Clopton learned that Tookie's phone number was 502-712-xxxx.[2]  *Id.*

On February 14, 2018, Clopton applied for a search warrant ordering AT&T to provide the data and other information for 502-712-xxxx.  *Id.* at 499.

In his affidavit, Clopton averred that that:

Acting on the information received, affiant conducted the following investigation:
- The victim was identified as Vincente [Ramirez] . . .
- The victim was found inside his vehicle while driving on or in the area of Poplar Level Road.
- When the victim was pulled out of his vehicle by LMPD officers, he was in possession of a handgun in the right side of his pants.
- After forensically examining the victim's cell phone and cell phone records, it was determined the victim was in the area of Plane Tree Dr. and Lagoona Dr. when he called E911.

---

[1] The DEA began intercepting and listening to Rodriquez's phone calls in December 2017.  [DE 140-2 at 489].

[2] Throughout this Opinion, the Court has redacted the last four digits of the phone number.

- Detectives determined through the victim's cell phone geo-locations the victim was shot prior to arriving at 4903 Poplar Level Rd. Detectives were unable to find the original scene of the shooting.
- Detectives interviewed witnesses' on scene; witnesses indicated they believe the victim may have been involved in a robbery in the days prior to the murder. Witness stated his involvement in the robbery most likely be [sic] the cause of the murder.
- Through investigative measures and the use of a reliable confidential informant (identity of confidential informant disclosed with judge) detective determined the listed cell phone number, (502) 712-[xxxx], belongs to the suspect that assaulted the victim causing death by gunshot wound. It was learned through the use of the confidential informant the suspect's nickname is "Tookie." It was also learned through the use of the confidential informant the suspect was given $30,000 to kill the victim over his involvement in the robbery that the victim was believed to have been involved.
- Detective intends to use the cell phone records and geo-location records of the listed number to determine the location of the shooting, identity and location of the suspect.

*Id.*

Based on Clopton's affidavit, a Kentucky District Court Judge found probable cause for the search and authorized it. *Id.* at 501.

The DEA continued intercepting Rodriguez's phone calls. [DE 140-2 at 492]. Rodriguez and Castle allegedly "admit[ted] to paying 'Tookie,' who was subsequently identified through wire interceptions and a LMPD traffic stop as Charles Cater, $30,00 to kill Ramirez and Smith." *Id.* After learning of Cater's "involvement," the DEA surveilled him and determined that he lived at 7619 Buena Vista Court. *Id.* at 493.

Brian Sanders ("Sanders"), a special agent with the DEA, drafted a search warrant for Cater's residence, Castle's residences, and Rodriguez's residence. *Id.* at 479; DE 140-1 at 456-57. Sanders used the same affidavit for each warrant. [DE 140-1 at 454].

In support of the search warrant, Sanders submitted an eleven-page affidavit. *Id.* at 484-95. In his affidavit, Sanders described, among other things, the DTO, the conspiracy to distribute, and Cater's role in it. *Id.* Based on Sanders' affidavit, the United States District Court Magistrate

3

Judge determined that there was probable cause to search Cater's residence at 7619 Buena Vista Court. *Id.* at 496.

## B. Arresting Cater

On the morning of February 28, 2018, the DEA executed the search warrant at Cater's house and recovered multiple cell phones, marijuana, and a handgun. *Id.* at 498. Detective Winstead ("Winstead") arrested Cater at work and transported him to the federal building. [DE 183 at 1132]. The DEA did not secure a warrant for Cater's arrest. *Id.* at 1103. Winstead did not tell Cater why he was under arrest. *Id.* at 1132. During that same day, agents from the DEA also interviewed Defendants Castle and Rodriguez. *Id.* at 1095.

During the hearing, Cater's counsel asked Clopton and Sanders to explain what the probable cause was for arresting Cater without a warrant. Clopton responded:

A. Sir, we had gained probable cause through multiple phone conversations and – and evidence that we had collected throughout the investigation.

Q. Okay. Phone calls. And what else?

A. Other evidence that we had gathered throughout the investigation.

Q. And that's what I'm trying to ask. What other evidence?

A. I can't remember off the top of my head without having my case file with me what all evidence was gathered that led us to that. Mostly it was the wire taps.

Q. Who determined whether there was—and I'm hearing you say telephone calls and I'm also hearing you say wire taps; is that true?

A. So the—yes.

Q. Okay. And you're saying other evidence that you can't recall because you don't have your case file in front of you; is that true?

A. Right.

*Id.* at 1104.

Sanders explained:

A.  It – no, it's not all laid out in the criminal complaint. In a discussion between myself, other co-case agents at the DEA, detectives from the LMPD Homicide Unit, as well as the U.S. Attorney's Office. On February 23rd we had options on the table to arrest Mr. Cater on the federal end as far as the overarching criminal conspiracy and the narcotics investigation as well as the ability to arrest Mr. Cater in the state system based on the murder of Mr. Ramirez.

Q.  And I hear you say you had information that created probable cause to arrest him –

A.  Phone wire taps, geolocation over cell phones, things of that nature.

Q.  Okay. And so that's what we're getting at.  So the phones and wire taps, you're saying you had recordings of Mr. Cater having conversations with Mr. Rodriguez and Mr. Castle, correct?

A.  Conversations, yes.

Q.  Okay. And then I asked you what illegal conversations or what conversations they were having regarding any illegal activity and you said marijuana— conversation about marijuana?

A.  The distribution of marijuana, but it was clear based on our interceptions that Mr. Cater was an integral part of Mr. Rodriguez's DTO.

Q.  And that's what I'm trying to get at. Explain that. What conversations did you hear that led you to believe that he was an integral part of the DTO?

A.   Again, as I stated earlier, high-level narcotics organizations are typically compartmentalized in order to minimize risk.  I don't want to be the person that's in charge of negotiating, purchasing, pricing, as well as storing, as well as distribution, as well as carrying out assassinations on others that may have robbed me for fear of exposure.  Mr. Rodriguez's role was to negotiate the purchase of narcotics, whether that be crystal methamphetamine, marijuana, heroin.  Once the narcotics arrived, Mr. Castle was responsible for acquiring the drugs, oftentimes distributing the drugs at Mr. Rodriguez's behest. And based on the calls that we intercepted, Mr. Cater was essentially the muscle of the organization.  Should you get robbed for $70,000 and retribution need to be paid, Mr. Cater or Tookie who we knew him as at the time was responsible for that.

Q.   Are you suggesting that you had that information prior to the—prior to the January 16, 2018, robbery?

A.  Again, I don't know the timeline of it.  You asked me what our probable cause was and I told you over the course of interceptions, which was over two months, that was the information that we gleaned from the interceptions.

Q.  Right. And so, again, what I'm trying to figure out is what you knew and when you knew it.  That's what's important.

. . .

Q.  So you had no reason prior to January 16th to identify Tookie—there was no recordings, there was no nothing putting the word "Tookie" along with this role of enforcer because there had never been a robbery of any drugs prior to that time; is that correct?

A.  To my knowledge, no. We did not intercept any other robbery—

Q.  Right. So—

A.  –prior to the 16th.

Q.  And you didn't label Mr. Cater or Tookie as an enforcer until after that robbery, correct?

A.  Again, I can't swear to the time line of when we deemed everyone's roles. Again, there's hundreds if not thousands of wire calls.

Q. I'm not asking you a specific date. I'm saying would it have been prior to the robbery of the heroin?

A.  It could have been, yes.  I don't recall a date.  To expand a little further, if I may? In an investigation such as this, we're listening to these calls.  Depending on how active the phone is, you may get 20 calls a day. You may get 200 calls a day. Every day—every morning case agents will go in and we will listen to these wire calls.  You hear certain things—little bits here and there early on that—that maybe the first or second day of an investigation that a week later start to make sense and paint a picture as to who these individuals are and their roles in the organization, so that is why I can't give you an exact date on when we labeled everyone in their roles within the organization.

Q.  So you had the wire tap conversations between Mr. Castle and Mr. Rodriguez discussing paying Tookie $30,000 for a murder.  What other probable cause—or what other facts did you have to establish probable cause for his arrest?

A.  We had the murder of Mr. Ramirez.  We had the geolocation data over Mr. Cater's phone which only confirmed our beliefs based on what we heard over the wire that Mr. Cater was present at the murder.

6

Q. Okay. And you said you heard that he was there the day? I'm sorry. I didn't hear that last part.

A.  We had wire interceptions.  We had the murder of Mr. Ramirez. We had geolocation over Mr. Cater's phone which allowed members of the DEA and LMPD Homicide Unit to confirm our suspicions and our beliefs that Mr. Cater was an active participant in the murder of Mr. Ramirez.

*Id.* at 1205-07, 1209-10.

## C.  Interrogating Cater

Law enforcement interrogated Cater twice.  Clopton and Chris Middleton ("Middleton") conducted the first interview.  Clopton began the first interview by asking Cater: "You got any idea why you're here today?"  [DE 161-4 at 741].  At this point, Cater had not been read his *Miranda* rights.  [DE 183 at 1085].  During the sixteen minutes between the first question of the interview and when they Mirandized him, Clopton and Middleton asked Cater about: how well he knows Castle; how often he "hangs out" with Castle; his age; his full name; if he has a preferred "nickname"; his address and phone number; his birthday; his steroid use; why he went to prison; his family.  [DE 161-4 at 741-756].  After asking him these questions, Clopton told Cater:

Q.  Well, I want to talk to you about what's going on, okay?

A.  Okay.

Q.  Before we can talk to you, obviously, you've got handcuffs on.

A.  Yeah.

Q.  And we've got you in this room here.  We can't just let you go.

A.  I understand.

Q.  And you have some rights.

A.  I understand.

Q.  So I need to read those to you first, okay?  So we'll go ahead and get that knocked out. Then we'll talk, okay?

*Id.* at 756.

Clopton then read Cater his *Miranda* rights:

Q.  Before we can ask you any questions, you must understand your rights.  You have five different rights:  You have the right to remain silent; anything you say can and will be used against you in a court of law; you have the right to talk to a lawyer prior to any questioning or making of any statements and to have them present with you while you're being questioned; if you cannot afford to hire a lawyer, one will be presented to the court to represent you before any questioning, if you desire one; and you may stop the questioning or make any statements at any time by refusing to answer further or by requesting to consult an attorney prior to continuing the questioning or making any statements.  So this bottom part here is where you acknowledge that I read those to you, okay?

A.  Yes, sir.

Q.  It says, "I have read this statement of my rights or had them read to me, and I understand what my rights are.  I'm willing to make a statement and answer questions.  I do not want a lawyer at this time. I understand and know what I am doing.  No promises or threats have been made to me, and no pressure or coercion of any kind have been used against me."  You understand that, right?

A.  Yeah.

Q.  Okay.

*Id.* at 756-57.

Before signing the waiver form, Cater had a question:

A.  Before I sign, I know it says I know what I'm—I have read this statement and my rights, I understand my rights.  I'm willing to make a statement and answer any questions.  I do—I need to know what—

But Clopton declined to answer his question because doing so would be "infring[e]" on

Cater's rights:

Q.  I can't tell you what we're going to talk about yet until you sign that.

A.  Oh, okay.

8

Q.  Okay.

A.  All right.

Q.  Because then I would be infringing on your rights, and I absolutely do not want to do that.

A.  I understand.

During the suppression hearing, Clopton explained why he believed answering Cater's question would "infring[e]" on Cater's rights:

Q.  What rights would you be infringing upon by notifying Mr. Cater the purpose for the interview?

A.  He has a right to remain silent. I was being overly abundantly careful to try not to do that.

Q.  Well, it would be you that would be doing the talking, not him.  So how was his right to be silent invoked in that situation?

A.  What—I don't understand.  What do you mean?

Q.  I asked you what rights you would be infringing upon if you notified him the purpose of the interview and you said "I would be violating his right to remain silent."

A.  I guess I wouldn't be violating any of his rights then, but when he first got there, if you remember, he was over chatty and almost—I mean, he wanted to talk.  He was almost spilling everything he said. I didn't want him to do that before we got through the rights waiver.

*Id.* at 1112.

With no break in the interrogation other than the time it took to read Cater his *Miranda* rights, Clopton asked Cater "[y]ou and Dwayne been into any kind of—any kind of stuff here lately?"  *Id.*  In response to that question and others asked throughout second part of the interrogation, Cater admitted that: he has been selling marijuana; Rodriguez calls him "Tookie"; Rodriguez gave him the marijuana; he knows about the robbery; he does not know what they did to the people who robbed them; he was with Rodriguez and Castle when they got robbed;

9

Rodriguez asked him to "do something to that boy," but he could not do it; Castle killed Ramirez; Rodriguez is the "boss" and Castle "holds everything" for him; after Castle got in the car, he told them that he shot Ramirez; he Rodriguez picked Castle up after he shot and killed Ramirez; Castle had a "boatload" of drugs at his house; and Rodriguez and Castle did not give him $30,000. *Id.* at 772-785. But, despite admitting those facts, Cater repeatedly denied shooting Vincente Ramirez. *Id. a*t 768. The interrogation ended at approximately 12:30 p.m. [DE 161-2 at 691]. Clopton and Middleton left the interrogation room.

Clopton and Middleton returned at approximately 5:30 p.m. *Id.* at 693. They were joined by Sanders. *Id.* They did not re-read Cater his *Miranda* rights before they resumed questioning of him. [DE 183 at 1173]. Cater continued to deny shooting Ramirez. Towards the end of the interrogation, when Cater refused to provide them with additional information, the officers had the following exchange with Cater:

> Sanders: I'm the bad guy here. So the way this is going to work, I'm going to get a federal criminal complaint, that a judge will sign, and he will sign, and they'll give me an arrest warrant for you guys. This case is a little bit different. You guys are kind of a big deal right now. You ever heard of RICO?
>
> Cater: No, sir.
>
> Sanders: Like organized crime, mafia shit?
>
> Cater: Yeah.
>
> Sanders: You guys are now considered an organized criminal organization.
>
> Cater: (inaudible).
>
> Sanders: Because you guys are drug dealers, and do you violence in furtherance of drug dealing, i.e., murder. So my complaint is going to read exactly what I just told you, plus Mr. Castle and Mr. Rodriguez laid the whole fucking thing out. Because you know what, they didn't do it. They're going to do everything they can to save their ass. They didn't do it. You did. And in two weeks what's going to happen is myself and a couple other guys in the U.S. Attorney are going to go to Washington, and we're going to present this case to the Department of Justice for

the death penalty, because that's what this carries.  It carries a mandatory minimum of life.  You'll never get out, ever, ever, and you may get lethal injection.

Now, how we present this depends on the conversation we're having right now.  We don't have to do that, but you got to give us a reason to not ask for  it because there's a lot of people out there, including Mr. Ramirez's parents, that are going to have a lot of  questions.
. . .

Cater:  I understand that, man.  I'm just telling you, I'm not no murderer, man.  I'm not, man.

Sanders:  You are.  You are.  And we know it, and we can prove it.  That's the worst part about it.

Clopton:  You may not be in your heart.  You made have been forced to murder somebody.  I don't know.  But the fact is, you did it.

Sanders:  And if we walk out of here today, this is what I can promise you.  I could promise you two things.  I can't sit here and tell you if you confess to it, I'm going to let you out of here; if you confess to it, you'll never go to jail; if you confess to it, you'll do ten years.  I can't tell you that.  But what I can tell you is that a lot of the decisions that are made by a federal prosecutor, U.S. Attorney—

Cater:  This is unreal.

Sanders:  —he listens to us.

. . .

Middleton:  Here's the—here's the thing, man.  He's getting—and I don't want you to mislead me something, all right?  You know, when we tell you that there's a range of penalties, that's what the range of penalties—it's just like me telling you that when, you know, on average somebody gets, you know, a death sentence in the federal system, it's like 15 to 18 months before it's carried out.  It's not like 20 years in the state where you're fighting all these appeals.

[DE 161-5 at 878-80, 888].

After this exchange Cater admits further involvement with a cocaine shipment.  *Id.* at 894.

## D.  Presenting Cater to the Magistrate Judge

Law enforcement officers arrested Cater in the morning and did not finish interrogating him until after 5 p.m. on a Friday afternoon.  Agent Sanders testified that he was aware the United States Clerk's Office closes at 4:30 pm.  [DE 183 at 1185].  That said, Detective Clopton testified that in the gap between Cater's first and second interview he was interviewing Defendant Castle and Defendant Rodriguez.  *Id*. at 1119.  Because multiple interrogations were happening on the same day, investigators could confront Defendant Castle with information provided by Defendant Cater and vice versa.  *Id*. at 1095; 1097; 1122.  Additionally, based on information Defendant Castle relayed to investigators, the LMPD Homicide Unit and members of the DEA went to a location where they believed the gun was located.  *Id.* at 1214.  Agent Sanders also stated that during this time he was consulting with members of DEA on where Cater was ultimately going to be charged.  *Id.* at 1097.  Though he started working on the Complaint with the U.S. Attorney's Office, it was not signed until the following Monday after Cater's arrest.  *Id. a*t 1186.  Agent Sanders also stated that there was an appointment to see the Magistrate Judge on Monday, February 26.  *Id.*

Soon after, a federal grand jury returned a two-count Indictment against Cater and his co-defendants, Rodriguez and Castle.  [DE 23].  On August 18, 2021, a federal grand jury returned a seven-count Superseding Indictment against Cater and his co-defendants.  [DE 175].  Count 1 alleges conspiracy to possess with intent to distribute controlled substances.  *Id.* at 1019.  Count 2 alleges use, possession and discharge of a firearm during and in relation to a drug trafficking crime resulting in murder.  *Id.* at 1020.  Count 3 alleges possession with intent to distribute methamphetamine.  *Id.* at 1022.  Counts 4 and 5 allege possession with intent to distribute fentanyl.  *Id.* at 1023.  Count 6 alleges possession of a firearm by a convicted felon.  *Id.* at 1024.  Lastly, Count 7 alleges conspiracy to obstruct justice-witness tampering.  *Id.* at 1024.

## II.   STANDARD

"It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Rodriquez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979).  The Sixth Circuit has made clear that the burden of proof on the defendant requesting suppression extends to both "the burden of production and persuasion." *United States v. Chaar*, 137 F.3d 359, 363 (6th Cir. 1998); *United States v. Patel*, 579 F. App'x 449, 453 (6th Cir. 2014).

## III.   DISCUSSION

Carter moves the Court to "to suppress evidence referencing, reflecting or constituting statements made by him, and any evidence derived therefrom, during the government's custodial interrogation of him on February 23, 2018."  [DE 161 at 685].  In support of his motion, Cater argues that the United States: (1) "arrested [him] on the February 23, 2018 without probable cause and obtained statements as evidence after violating his Fourth Amendment rights; (2) "did not obtain a valid waiver of [his] *Miranda* rights before its custodial interrogation of him, thereby vitiating the effect and validity of any subsequent warnings and/or waivers"; (3) "tactically implemented coercion and deception to ensure [he] was unaware of his constitutional rights to obtain involuntary and incriminating statements from [him], in violation of his Fifth Amendment right against self-incrimination"; and (4) "caused an unnecessary and unreasonable delay when it failed to present [him] before a Magistrate on charges for his warrantless arrest for the unlawful purposes of evidence gathering and to obtain a confession." *Id.* at 685-86.  The Court addresses these arguments in turn.

### A.  Probable Cause for Warrantless Arrest

First, Cater seeks suppression of all statements and evidence obtained as a result of his arrest on February 28, 2019, arguing officers lacked probable cause to arrest him. Cater argues that the arrest was made without probable cause because he was not observed committing a crime, police did not have a warrant for his arrest, he was not in the immediate vicinity of his home when it was searched, and there was no real-time evidence from the execution of the search warrant to support Cater's arrest. [DE 161-2 at 696, 698].

In response, the United States argues that Cater's arrest was not an improper detention pending the outcome of the search of his residence. [DE 189 at 1249]. Further, the United States argues that the record is replete with law enforcement's knowledge of facts establishing their reasonable belief of probable cause to arrest Cater for involvement in a drug conspiracy. [DE 189 at 1250]. The United States points to wiretap recordings that evidenced Cater was involved in the DTO as an enforcer, that he killed Ramirez for the robbery of a kilogram of heroin, and that the DTO was actively planning to kill others associated with that robbery. *Id.*

In reply, Cater argues that law enforcement lacked sufficient probable cause to arrest Cater because Agent Sanders was only able to point to one specific conversation, that Cater did not participate in, as the basis for his probable cause. [DE 183 at 137, 147]. Cater argues law enforcement only had historical geolocation data placing Cater in the general vicinity of the neighborhood in which criminal activity occurred, but there were no eyewitness or other forensic evidence to corroborate the data. [DE 192 at 1300]. Cater argues that the United States conflates the standards for probable cause to search Cater's residence and probable cause to arrest Cater, and though they are measured by similar objective standards, differing inquiries must be made for each. *Greene v. Reeves*¸ 80 F.3d 1101, 1106 (6th Cir. 1996). The Court will analyze whether there was probable cause for arrest using the applicable standards below.

The Fourth Amendment protects the "right of people to be secure in their persons . . . against unreasonable seizures." U.S. Const. amend. IV. "A warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009) (alteration in original) (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). Probable cause "is a flexible, common-sense standard" assessed from the perspective of a reasonable officer on the scene at the time of arrest. *United States v. Romero*, 452 F.3d 610, 615–16 (6th Cir. 2006); *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001). In determining whether probable cause exists, the Court must consider "whether, at the time of the arrest, the facts and circumstances within the arresting officer's knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent person to conclude that an individual either had committed or was committing an offense." *United States v. Torres-Ramos*, 536 F.3d 542, 555 (6th Cir. 2008) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Although a "mere suspicion of criminality" is insufficient, *Williams ex rel. Allen v. Cambridge Bd. Of Educ.*, 370 F.3d 630, 637 (6th Cir. 2004), probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity," *United States v. Ogbuh*, 982 F.2d 1000, 1002 (6th Cir. 1993) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n. 13 (1983)). In addition, an officer with probable cause to believe that a person has committed some crime need not know precisely what crime he has committed. *United States v. Anderson*, 923 F.2d 450, 457 (6th Cir. 1991). The question before the Court is whether, at the moment of Cater's arrest, the facts within the detectives' knowledge were sufficient to warrant a reasonable officer believing that he had committed or was about to commit a crime. The Court finds that they were.

Detective Clopton and Agent Sanders made the joint decision to arrest Cater.  [DE 183 at 1105].  Officer Winstead of Louisville Metro Police Department effectuated that arrest with other law enforcement personnel at Cater's place of employment, the Ford plant located on Fern Valley Road, based on Winstead's belief that Cater "was involved in a homicide and long term drug investigation."  *Id.* at 1131-1132, 1134-1135, 1137.  Detective Clopton testified that wiretap evidence connected Cater to the homicide of Vincent Ramirez.  *Id.* at 1129.  Sanders testified in detail during the suppression hearing about the probable cause to arrest Cater:

> Q.  So you had the wire tap conversations between Mr. Castle and Mr. Rodriguez discussing paying Tookie $30,000 for a murder.  What other probable cause—or what other facts did you have to establish probable cause for his arrest?
>
> A.  We had the murder of Mr. Ramirez.  We had the geolocation data over Mr. Cater's phone which only confirmed our beliefs based on what we heard over the wire that Mr. Cater was present at the murder.
>
> Q.  Okay. And you said you heard that he was there the day? I'm sorry. I didn't hear that last part.
>
> A.  We had wire interceptions.  We had the murder of Mr. Ramirez. We had geolocation over Mr. Cater's phone which allowed members of the DEA and LMPD Homicide Unit to confirm our suspicions and our beliefs that Mr. Cater was an active participant in the murder of Mr. Ramirez.

*Id.* 1209-10.

When asked about whether Agent Sanders was aware of whether Mr. Cater was present at the January 16, 2018 robbery of the drugs between Mr. Ramirez, Mr. Rodriguez and Mr. Castle, he testified:

> A.  . . .  We believe Mr. Cater was there based on both visual physical surveillance and pole camera footage and the interception of wire communications in which the overarching plan to prevent a robbery was discussed. Mr. Cater – who they did not call Mr. Cater at the time – Tookie and another individual were going to be situated in the real alley should anyone go running out of the back of the house. We observed Mr. Castle and Mr. Rodriguez, Tookie, and another individual depart prior to the robbery – depart a location in the Newburg area

16

> and drive down to the Victory Park area of Louisville where the robbery happened, so we were fairly certain – we were certain that Tookie was present.

*Id.* at 1196-1197.

When asked about decision to arrest the coconspirators in the investigation, Agent Sanders testified:

> Following the murder, our office expedited the process in taking this case down to prevent further loss of life. We intercepted more conversations indicating that maybe there was going to be retribution paid on a third individual which caused us to speed up the process in order to avoid this.

*Id.* at 1168.

Based on this testimony, the Court finds that there was probable cause to arrest Cater. Cater's initial argument that this was a search to detain the occupant of a premises while a proper search is conducted factually misses the mark since Cater was not at the premises when arrested, he was approximately five miles away, and his arrest was not based on the search of his premises. [DE 161-2, at 697]. The Fourth Amendment permits a duly authorized law enforcement officer to make a warrantless arrest in a public place even though the officer had adequate opportunity to procure a warrant after developing probable cause for arrest. *United States v. Wright*, 16 F.3d 1429, 1438 (6th Cir. 1994).

Cater's argument that he was not a party to the wiretapped conversation does not weaken the investigating officer's probable cause since hearsay can be used to show probable cause. *Draper v. United States*, 358 US 307, 311-312 (1959) (citing *Brinegar v. United States*, 338 U.S. 160, 172-173 (1949)). In *Draper v. United States*, the Court held that an agent had probable cause and reasonable grounds for believing that defendant was violating the federal laws relating to narcotic drugs based on information given by an informer that a person previously unknown to the agent would alight from a certain train on either of two days, wearing certain clothing and carrying

a tan zipper bag, would be walking fast, and carrying narcotics. *Draper,* 358 U.S. at 309. Though Castle's and Rodriguez's conversation was not from an informant, but from co-conspirators, their hearsay statements can still be used as a basis for probable cause.

Cater's arguments that the agents needed an eyewitness to the alleged criminal activity prior to an arrest are unavailing. This case is distinguishable from *Beck v. State of Ohio*, 379 U.S. 89, 96-97 (1964) where the Court found there was an insufficient basis for probable cause for arrest. In *Beck,* the arresting officer testified that the basis for arrest was merely that he knew what the defendant looked like, knew that the defendant had a previous record of arrests or convictions for violating the law, and that someone had told him something about the defendant without furnishing any additional details. *Id.* In contrast to those vague bases, here the wiretapped conversations, pole camera footage, and geolocation data obtained by Sanders raise reasonable grounds to support probable cause. Thus, the Court finds the arrest was supported by probable cause.

The United States also obtained two cell phones incident to Cater's arrest. [DE 189 at 1251]. Since the Court has found probable cause, the arrest was valid when made, the search was valid, and the seizure of the two cell phones was Constitutional. *See Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).

**B. Pre-*Miranda* Statements**

Cater moves to suppress his pre-and post-*Miranda* statements on grounds that he made these statements as part of a custodial interrogation without first being effectively advised of and knowingly and intelligently waiving his *Miranda* rights. [DE 161 at 6855]. The Court will address his pre- and post-*Miranda* statements below.

*Miranda* rights are not required for questions "reasonably related to the police's administrative concerns," such as the defendant's name, address, height, weight, eye color, date of birth, and current address. *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990); *United States v. Clark*, 982 F.2d 965, 968 (6th Cir. 1993) ("ordinarily . . . the routine gathering of biographical data for booking purposes should not constitute interrogation under *Miranda* ").    Investigatory questions, however, require the police to administer *Miranda* rights. *See United States v. Pacheco-Lopez*, 531 F.3d 420, 424 (6th Cir. 2008) (comparing case law and establishing the line between questions relating to the processing of an arrest that are biographical and questions of an investigatory nature).

The United States does not dispute that Cater was in custody, that Cater was not read his *Miranda* rights at the time of his arrest, and that his first statements were before his *Miranda* rights were read to him.  [DE 183 at 1081-182, 1085, 1133; DE 189 at 1255].  Cater argues that Detective Clopton's pre-*Miranda* questions and Mr. Cater's pre-*Miranda* answers were not merely biographical, they were part of the investigation, and so they should be suppressed.  [DE 161-2 at 701].  Cater argues Clopton and Middleton posed more than 50 questions before apprising Cater of his *Miranda* rights.  [DE 192 at 1302].

 The detectives' pre-*Miranda* questions and Cater's pre-*Miranda* answers cannot be described as merely biographical but were part of the detectives' investigation. While some questions were biographical, asking Cater, "You got any idea why you're here today? . . . I mean, can you come up with any kind of idea why you might be? . . . I know you said you hang out with some-with some bad guys," [DE 161-4 at 741], certainly was "reasonably likely to elicit an incriminating response," thus mandating a *Miranda* warning. *Innis*, 446 U.S. at 301; *see United States v. Hoyer*, 411 F. Supp. 3d 406, 409 (W.D. Ky. 2019), *appeal dismissed*, No. 19-6315, 2020

WL 835289 (6th Cir. Jan. 23, 2020)  (asking defendant "Why are we here?" was not a biographical question and was likely to elicit incriminating response).

This case is distinguishable from *Innis,* 446 U.S. at 302, where the Court found that defendant was not interrogated in a conversation that was merely a dialogue between two police officers and to which no response from the defendant was invited, and *Shaneberger v. Jones*¸ 615 F.3d 448, 454 (6th Cir. 2010) where the detectives directed the suspected not to respond to their comments.  Similarly, this case is distinguishable from *United States v. Avery*, 717 F.2d 1020, 1022-1024 (6th Cir. 1983) where the record indicated questions related to defendant's address and date of birth were to secure biographical data to complete the booking process, and did not relate, even tangentially, to criminal activity.

The context of these pre-*Miranda* questions and statements also supports a conclusion that a *Miranda* warning was required given that the detectives interviewed Cater in the federal building while he was sitting in a holding cell in handcuffs.  [DE 161-2, at 701].  *See United States v. Gasaway,* 2019 WL 5846889, at *4, (W.D. Ky. Nov. 7, 2019) (citing *United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) (a person handcuffed, even within his own home, would have understood that his freedom of movement was restricted to a degree comparable to that of an individual placed under formal arrest).   Cater was not free to leave. While the detectives did document Cater's information, the detectives also audio recorded the interview, and the questioning went beyond that needed for booking.  [DE 161-4 at 741-756].  The United States concedes that Cater's statements made in response to law enforcement questions made before his *Miranda* warnings should be suppressed.  [DE 189 at 1251].  Because the detectives did not administer the *Miranda* warning for these initial questions, the answers are "presumed compelled"

and "excluded at trial in the State's case in chief." *Oregon v. Elstad*, 470 U.S. 298, 317, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

The United States concedes that the pre-*Miranda* statements should be suppressed for its case-in-chief and instead argues that the pre-*Miranda* statements should be allowed for impeachment purposes on cross-examination. [DE 189 at 1253]. Thus, the pre-*Miranda* statements will be suppressed for the United States' case-in-chief and the only issue regarding the pre-*Miranda* statements is whether the United States should be permitted to use them for impeachment purposes.

### C. Pre-*Miranda* Statements for Impeachment

The remaining question is whether the United States can use Cater's pre-*Miranda* statements to impeach Cater on cross-examination. [DE 189 at 1251]. Cater argues that his pre-*Miranda* statements cannot be used to impeach because they were not 'patently voluntary' and the rule of *Elstad* only applies to situations in which an individual makes statements in response to "unwarned yet uncoercive questioning." *Elstad*, 470 U.S. at 318 (citing *Harris v. New York*, 401 U.S. 222 (1971)). When an unwarned statement is preserved for use in situations that fall outside the sweep of the *Miranda* presumption, "the primary criterion of admissibility remains the 'old' due process voluntariness test. *Id*. at 308. The inquiry is whether the failure to administer the warnings was accompanied by any actual coercion, improper tactics or other circumstances calculated to undermine the suspect's ability to exercise his free will in obtaining statements so that there was a violation of the defendant's constitutional rights. *Id*. at 299. The Court finds, after an examination of the circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his pre-*Miranda* statements, that these pre-*Miranda* statements were patently voluntary and so can be used for purposes of impeachment as there were no indica of coercion or improper tactics by police in the pre-*Miranda* portion of the interrogation.

### D.  Post-*Miranda* Statements

The issue regarding the post-*Miranda* statements is whether the *Miranda* rights given after Cater's first statements were ineffective, making these statements inadmissible.  *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).  The United States argues that *Missouri v. Seibert* is distinguishable.  *Id.* at 1254.

"No person shall be compelled in any criminal case to be a witness against himself."  U.S. Const. Amend. V.  In *Miranda v. Arizona*, the Supreme Court, in prescribing safeguards for the effectuation of the Fifth Amendment, held that "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).  The safeguards "prescribed by *Miranda* are to ensure that the police do not coerce or trick captive suspects into confessing."  *Berkemer v. McCarty*, 468 U.S. 420, 433, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).  If a suspect is interrogated while in custody and he does not voluntarily, knowingly, and intelligently waive his *Miranda* rights, any statements he makes to the police must be suppressed.  *Id.* at 429, 104 S.Ct. 3138.

A suspect is in custody if, under the totality of the circumstances, a reasonable person would not feel free to end the interrogation by the police and leave.  *See Yarborough v. Alvarado*, 541 U.S. 652, 663, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).  Police interrogation includes "not only . . . express questioning, but also . . . any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response."  *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

First, the Court looks to Cater's post-*Miranda* statements and whether they should be suppressed under *Missouri v. Seibert*, 542 U.S. 600, 611-612, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). The United States argues that *Seibert* does not apply in this context because the detective's subjective intent was not to treat the pre and post *Miranda* interrogations as continuous, and because they were not trained in the two-step interrogation process identified by the officer in *Seibert*. [DE 189 at 1266]. Yet the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

In *Seibert*, the Court addressed "*Miranda*-in-the-middle" when the police officers asked similar questions pre and post-warning. 542 U.S. 600, 615, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). A plurality of the Court set forth factors for courts to consider when determining whether *Miranda* rights delivered in the middle of an interrogation are effective: 1) "the completeness and detail of the questions and answers in the first round of interrogation"; 2) "the overlapping content of the two statements"; 3) "the timing and setting of the first and the second"; 4) "the continuity of police personnel"; and 5) "the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* If the results of the inquiry determine an effective warning, then "a court can take up the standard issue of voluntary waiver and voluntary statement; if no [effective warning], the subsequent statement is inadmissible for want of adequate *Miranda* warning, because the earlier and later statements are realistically seen as parts of a single, unwarned sequence of questioning." *Id.* at 612, n. 4, 124 S.Ct. 2601. The *Seibert* plurality held that the defendant's statements post-*Miranda* were inadmissible because the police did not

inform the suspect that her statements pre-*Miranda* could not be used, there was little time between interrogations, and the questions post-*Miranda* were a continuation of the questions asked before it was given. *Id.* at 616-617, 124 S.Ct. 2601.

Approximately sixteen minutes into the interrogation, Clopton told Cater:

Q.  Well, I want to talk to you about what's going on, okay?

A.  Okay.

Q.  Before we can talk to you, obviously, you've got handcuffs on.

A.  Yeah.

Q.  And we've got you in this room here.  We can't just let you go.

A.  I understand.

Q.  And you have some rights.

A.  I understand.

Q.   So I need to read those to you first, okay?  So we'll go ahead and get that knocked out. Then we'll talk, okay?

[DE 161-4 at 756].

Clopton read Cater his *Miranda* rights and obtained a signed waiver.  Then with no break in the interrogation, the detectives continued the interrogation.  At issue is whether "it would be reasonable to find that in [this] circumstance[ ] the warnings could function 'effectively' as *Miranda* requires . . . [f]or unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment." *Missouri v. Seibert*, 542 U.S. 600,

611-612, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).  As discussed below, all five *Seibert* factors

support suppression of Cater's post-*Miranda* statements.

a. *Completeness and detail of questions and answers pre-Miranda*

The first *Seibert* factor is "the completeness and detail of the questions and answers in the

first round of interrogation." 542 U.S. at 615, 124 S.Ct. 2601.  This factor favors suppression.

Clopton asked Cater "You got any idea why you're here today?"  [DE 161-4 at 741], as well as

questions about how well he knows Castle; how often he "hangs out" with Castle; his age; his full

name; if he has a preferred "nickname"; his address and phone number; his steroid use; why he

went to prison; his affiliation with a person "who got caught with all that weed"; and his family.

The United States primarily relies on *United States v. Wooten*, 602 Fed. App'x 267, 268

(6th Cir. 2015) to argue that the questions and answers given to the pre-*Miranda* questions were

incomplete and could have been verified by other means or were already known by the

investigators.  [DE 189 at 1259].  In *Wooten*, the FBI agents asked the defendant about his email

address, his relationships, his access to computers and asked him to identify a photograph of his

daughter in what ultimately led to a prosecution for distribution, possession and receipt of child

pornography.  *Wooten*, 602 Fed. App'x at 268.  The types of questions in *Wooten* establishing

possession of a computer and email address, which are not crimes, differ significantly from the

types of investigatory questioning here which went directly to drug dealing and Cater's

relationship with known drug-dealers.  Detective Middleton even testified that finding out Cater's

and Castle's knowledge of each other was important to the investigation.  [DE 183 at 1159].

Though the pre-*Miranda* questioning here was not as detailed as in *Seibert*, Detective

Clopton still asked the questions necessary to "make an arrest, tailor their post-*Miranda*

interrogation, and secure a conviction." *United States v. Ray*, 690 F. App'x 366, 372 (6th Cir.

2017) (citing *United States v. Ashmore*, 609 F. App'x 306 (6th Cir. 2015)) (internal quotation marks omitted); *see also United States v. Pacheco-Lopez*, 531 F.3d 420, 422-28 (6th Cir. 2008) (finding first factor satisfied where initial questioning consisting of asking the defendant's name, where he lived, and how he arrived at a house involved with drug trafficking).   Thus, the pre-*Miranda* questioning was "detailed and complete enough" to suggest the *Miranda* warning was ineffective.   *Id.* at 373; *see United States v. Hoyer*, 411 F.Supp.3d 406, 411 (W.D.Ky. Oct. 21, 2019).

### b.  *Overlapping content of the two statements*

The second factor examines "the overlapping content" of the statements made by the defendant before and after the *Miranda* warning.   *Seibert*, 542 U.S. at 615, 124 S.Ct. 2601.   In *Pacheco-Lopez*, the officers first asked the defendant his identity, where he lived, and how he arrived at the house.   531 F.3d at 422.   The defendant answered that he was from Mexico and had just driven to Kentucky that week, after which the officers *Mirandized* him and then asked if he had brought drugs to residence.   *Id.*   The Sixth Circuit held that despite the new questions, such questions were the "the next logical question[s] based on the earlier statements," therefore, satisfying the second factor.   *Id.* at 428.   Extended admissions post-*Miranda* compared to brief admissions pre-*Miranda* do not signify a lack of overlap.   *Ray*, 690 Fed. App'x. 366 at 373.   In *Ray*, the defendant admitted to possessing firearms and having served time in federal prison before the *Miranda* warning.   *Id.*   When answering questions post-*Miranda*, the defendant elaborated on his prior responses.   *Id.* at 373-374.   The Court found that during the post-*Miranda* questioning, the officers followed up on the pre-*Miranda* responses based on the knowledge that they gleaned during the initial questioning.   *Id.* at 373.   The same can be said of Cater's interrogation.

The Court now turns to a comparison of the pre and post *Miranda* statements. Pre-*Miranda* Cater is asked, "Q: What—how well do you know – how well do you know Dwayne Castle? A: I know him. Q: You all boys or hang out quite a bit? A: We – yeah. I mean, I'm going to be honest with you. I didn't grow up with him. Q: Uh-huh. A: But we start kicking it for a little while, got involved in – in selling – selling drugs and that was it." [DE 161-4 at 742]. Post-*Miranda* he is asked, "You and Dwayne been into any kind of- any kind of stuff here lately? A: Being honest? . . . I've been fooling around with marijuana. " *Id.* at 758. Then again post-*Miranda* Detective Middleton asks, "How long have you known Castle? A: I've -- I knew him growing up, but I didn't hang around with him. Q: How long have you been hanging with him? A: Now? Q: Yeah. A: I want to say for probably the last few years, maybe two years or a year." *Id*. at 789.  The wire intercepts started in December 2017.  [DE 183 at 1188].

Question Pre-*Miranda*: "Q: White boy? A: Yeah. Q: The one that got caught with all that weed? A: Yeah." [DE 161-4 at 746].  Question Post-*Miranda*: "Q: What kind of dealings did you have with the Mexican, with Junior? A: That's where the weed and all that stuff comes from . . . Q: Well, tell me about – tell me a little bit about that works. I mean, where --- how do you all get the weed, and how does he give it to you?" *Id.* at 761.  Also post-*Miranda* Cater says, "I sell – and again, I'm just telling you, I sell $35.00 little weed pieces to people. You know what I'm saying? I do, and I try to get a little money like that. That – that's my only way of trying to make some extra money, man." *Id.* at 799.

Pre-*Miranda* Cater was asked, "Q: You got a nickname you prefer to be called? A: No. Charlie is all they call me." *Id.* at 745.  Post-*Miranda* he was asked about a nickname again, "Q: This has been a couple of months in the making, all right? Have you ever been called Tuki before? A: Yeah. Q: Who called you Tuki? A: A Mexican. Q: Which Mexican? A: Junior." *Id.* at 760.

As in *Ray and Pacheco-Lopez*, the pre-*Miranda* statements about Cater's relationship with Castle and his involvement with drug dealers [DE 183 at 1088], substantially overlapped with Castle's post-*Miranda* statements. While Cater elaborated on his earlier admissions post-*Miranda*, that elaboration was made possible because of the overlapping content between what he was asked pre-*Miranda*. While these statements were not identical, as they were in *Seibert*, a "hyptertechnical analysis of whether the pre and post *Miranda* questioning an answer mirrored one another" is not required to prove overlap. *Ray,* 690 F.App'x 366, 374 (6th Cir. 2017). This factor suggests the *Miranda* warning Cater received was ineffective.

### c. Timing and setting of the first and second interrogations

The third *Seibert* factor is "the timing and setting of the first and the second interrogations." 542 U.S. at 615, 124 S.Ct. 2601. In *Pacheco-Lopez*, the interrogations occurred in the same place and the only break between them was to read the defendant his *Miranda* rights. 531 F.3d at 427. Thus, the court found the third factor favored suppression of the post-*Miranda* statements because "administration of the *Miranda* warning could not lead a suspect to a meaningful understanding that he could cease answering the questions at that point in time." *Id.* at 427.

The factual scenario here aligns closely with *Pacheco-Lopez.* Here, the only break in the interrogation was when Cater was given his *Miranda* rights, the interrogation was completed in the same setting, and the questions post-*Miranda* were continuous with the first. Cater's interrogation reflects the exact problem described by the Supreme Court *Seibert*: "Unless the warnings could place a suspect who has just been interrogated in a position to make [ ] an *informed choice*, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment." 542 U.S. at 612 (emphasis added). There was no break in the questioning

or any effort by the detectives to ensure that Cater understood that his prior statements could not be used against him. As a result, a suspect in Cater's situation would have viewed the two series of questions as part of a single interrogation. The United States also concedes that the third factor favors Cater. [DE 189 at 1256]. Thus, the third factor supports suppression.

> ### d. Continuity of police personnel

The fourth *Seibert* factor looks to "the continuity of police personnel." 542 U.S. at 615, 124 S.Ct. 2601. The same detectives were present for the entirety of both interrogations; thus, this factor is supports suppression. *See Pacheco- Lopez*, 531 F.3d at 427; *Hoyer*, 411 F.Supp.3d at 412. Even though Agent Sanders joined the second interrogation [DE 183 at 1115], a majority of the post-*Miranda* interrogation and pre-*Miranda* interrogation was done by Detectives Clopton and Middleton so that there was continuity of police personnel. *Ray*, 690 Fed. App'x at 375 (finding the test is practical continuity of police personnel between initial and follow-up interrogations, not absolute continuity or else then police departments could easily circumvent it.) The United States concedes that the fourth factor favors Cater. [DE 189 at 1256]. Thus, the fourth factor also supports suppression.

> ### e. Degree to which interrogator's questions treated second round as continuous with first.

The last *Seibert* factor examines "the degree to which the interrogator's questions treated the second round as continuous with the first." 542 U.S. at 615, 124 S.Ct. 2601. In *Pacheco-Lopez*, the Sixth Circuit ruled that when "there [is] no break in the questioning or any effort by the police to ensure that [a defendant] understood that his prior statements could not be used against him . . . we believe that any suspect in [the defendant's] situation would have viewed the two series of questions as part of the one sequence." *Pacheco- Lopez*, 531 F.3d at 427-428. Clopton stopped the questioning and Mirandized Cater after Cater said, "I just want to know what is going on."

[DE 161-4 at 756].  Immediately after Mirandizing Cater, Clopton asked Cater: "You and Dwayne been into any kind of—any kind of stuff here lately?"  *Id.* at 758.  Clopton's question after he read Cater his *Miranda* rights is much like one of the first questions he asked Cater when he started the interrogation with: "Q. What—how well do you know—how well do you know Dwayne Castle? A. I know him.  Q. You all boys or hang out quite a bit?"  *Id.* at 742.  Cater was asked similar questions about his relationship with Castle, and he was *Mirandized* with no break in the interrogation.  As a result, the two series of questions could be viewed as one sequence.  In *Ray,* the Court found that officers asked the defendant questions post-*Miranda* that were derivative of his earlier admissions, even if those earlier admissions were "brief and cursory."  *Id.* at 376.  Similarly here, the officers did not ask Cater if he knew Castle after he was Mirandized, instead they asked, "You and Dwayne been into any kind of—any kind of stuff here lately?" presumably because they knew Cater already admitted to knowing Castle. In fact, during the convoluted exchange that occurred after Detective Clopton reads the waiver form, and Cater tries to ask a clarifying question, Cater specifically references the pre-*Miranda* questions about Castle.

> A: Before I sign, I know it says I know what I'm -- I have read this statement and my rights, I understand my rights. I'm willing to make a statement and answer any questions. I do – I need to know what --
>
> Q: I can't tell you what we're going to talk about yet until you sign that.
>
> A: Oh, okay.
>
> Q: Okay.
>
> A: All right.
>
> Q: Because then I would be infringing on your rights, and I absolutely do not want to do that.
>
> A: I understand.
>
> Q: 11:10. All right.

A: Because you asked me about Dwayne Castle.

*Id. a*t 757-758.

During and after this exchange, at no point was it made clear that Cater's statements before *Miranda* were inadmissible. Thus, this factor weighs in favor of suppression and suggests that the *Miranda* warnings were ineffective here.

> *f. Conclusion*

In sum, the factors identified by the *Seibert* plurality all show that a reasonable person could not have seen the questions post-*Miranda* as a new and distinct experience. *Ray*, 690 Fed. App'x 366 at 377 (citing *Seibert*, 542 U.S. at 615, 124 S.Ct. 2601). Consequently, the *Miranda* warning was ineffective, and Cater's statements post-*Miranda* must be suppressed. The United States did not argue for the use of the post-*Miranda* statements for impeachment purposes and the Court therefore does not address this.

> **E.      Voluntariness of Confession**

The United States argues that Cater effectively waived his rights knowingly, intelligently, and voluntarily and that his statements during the first and second interviews were uncoerced. [DE 189 at 1277-1278]. Cater argues that not only was the *Miranda* warning ineffective under *Seibert*, which the Court agrees with, but also that coercion was present throughout the first and the second interviews if the waiver is found to be voluntary. [DE 189 at 1273]. If the Court had found that a *Miranda* warning was effective, it would have turned to an analysis of whether Cater effectively waived his rights. However, because Clopton's *Miranda* warning was ineffective, Cater could not waive his *Miranda* rights and thus the Court need not determine whether his *Miranda* waiver was made knowingly, voluntarily, and intelligently. *See Seibert*, 542 U.S. at 612 n.4, 124 S.Ct. 2601 (describing how a defendant cannot waive his *Miranda* rights if the warning was ineffective).

Though the Court believes that suppression under *Seibert* also applies to the second interrogation as a continuation of the post-*Miranda* interrogation, [DE 189 at 1277], the Court will address the parties' arguments for the sake of completeness and given the significant gap in time between the first and second interrogation.

"A suspect may waive their rights, but a waiver 'must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege." *Edwards v. Arizona*, 451 U.S. 477, 482 (1981). A waiver is valid if "the totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension. *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *United States v. Murphy*, 763 F.2d 202, 208 (6th Cir. 1985); *Fare v. Michael C., 442 U.S. 707, 724 (1979)*. The totality of the circumstances can include such factors as age, education, and intelligence of the defendant; whether the defendant has been informed of his *Miranda* rights; the length and extent of the questioning; and the use of physical punishment, such as deprivation of food or sleep. *McCalvin v. Yukins*, 444 F.3d 713, 719 (6th Cir. 2006).   Courts must "indulge in every reasonable presumption against waiver." *Brewer v. Williams*, 430 U.S. 387, 404 (1977). The prosecution bears the burden of proving the waiver by at least a preponderance of the evidence and the voluntariness of the confession. *Colorado v. Connelly*, 479 U.S. 157, 169 (1986); *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

A suspect's statement to police is involuntary and inadmissible if the suspect's will is "overborne in such a way as to render his or her confession a product of coercion." *Arizona v. Fulminate*, 499 U.S. 279, 288 (1991). A confession is coerced and involuntary if: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the

defendant's decision to offer the statement. *United States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003) (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)).

Coercion may involve psychological threats as well as physical threats. *United States v. Finch,* 998 F.2d 349, 356 (6th Cir. 1993). Mere promises to recommend leniency and speculation that cooperation will have a positive effect do not constitute coercion. *United States v. Delaney,* 443 Fed. App'x122, 129 (6th Cir. 2011). That said, "broken or illusory" promises of leniency are coercive. *Johnson*, 351 F.3d at 262 n.4. An illusory promise is one that lacks substance and "does not commit the police to undertake or refrain from any particular course of action." *Id.* at 262, n.1. *United States v. Harrison,* 34 F.3d 886, 891–92 (9th Cir.1994) ("[T]here are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor."); *see also United States v. Melnikas,* 929 F.Supp. 276, 281 (S.D. Ohio 1996) ("Threatening to inform the court or a prosecutor of a suspect's refusal to cooperate in order to elicit such cooperation violates an individual's Fifth Amendment right to remain silent and is clearly coercive."); *United States v. Tingle,* 658 F.2d 1332, 1336 (9th Cir.1981) (finding a defendant's confession involuntary where the agents threatened to communicate her lack of cooperation to the prosecutor and warned that defendant would not see her two-year old child "for a while"). That the police were not seeking to elicit a confession is not enough to render the statements voluntary under undeniably coercive circumstances. *United States v. Murphy*, 763 F.2d 202, 208 (6th Cir. 1985).

1. Cater's Post-*Miranda* First Interrogation Statements

Cater argues that the detectives mislead Cater as to the purpose of signing the *Miranda* waiver form. Cater argues and the transcript confirms that Clopton stated that Cater's signature on

the waiver form was to acknowledge Clopton's reading of the form and that after being read the

form, Cater tried to ask questions about it but was interrupted.  [DE 161-2 at 713].

> Q: So this bottom part here is where you acknowledge that I read those to you, okay?
>
> A: Yes, sir.
>
> Q: It says, 'I have read this statement of my rights or had them read to me, and I understand what my rights are. I'm willing to make a statement and answer question. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me, and no pressure or coercion of any kind have been used against me.' You understand that, right?
>
> A: Yeah.
>
> Q: Okay.
>
> A: Before I sign, I know it says I know what I'm -- I have read this statement and my rights, I understand my rights. I'm willing to make a statement and answer any questions. I do – I need to know what --
>
> Q: I can't tell you what we're going to talk about yet until you sign that.

[DE 161-4, at 758].

Deceiving the Cater about the purpose of a waiver clearly subverts the purpose of *Miranda*.

These post-*Miranda* first interrogation statements have already been suppressed under *Seibert*.

3.  Cater's Second Interrogation Statements

Approximately five hours after the first interview concluded, Cater was moved to a DEA

video equipped holding room and his second interview began with Clopton and Middleton who

requested to "revisit" some things with Cater.  [DE 189 at 1277].  Agent Sanders participated in

the second interrogation as well.  [DE 161-5 at 856.]  The Court notes at the outset that Cater was

not read his *Miranda* rights before the second interrogation started.

Cater argues that law enforcement officials suggested that his right to remain silent may

result in harsher treatment by a court or prosecutor, and accordingly all statements from the second

interrogation should be suppressed.  [DE 161-2 at 718].   The Court analyses these statements under the *Mahan* factors.

First, under *Mahan*, the Court looks to whether the police action was objectively coercive. Cater argues that law enforcement officers misstated the law and the facts involving the death penalty.  [DE 161-2 at 720].  In response, the United States argues that it did not misstate the seriousness of the investigation or the possible penalties because aggravated murder is a capital crime under federal and state law. 18 USC §3591, and §3592; Ky. Rev.Stat. 507.020.  [DE 189 at 1274.]  The United States argues that at the time of the interview, there was no active moratorium on the federal death penalty.  [DE 189 at 1274].  Specifically,  Cater was told:

> Sanders:
>
> And in two weeks what's going to happen is myself and a couple other guys in the U.S. Attorney are going to go to Washington, and we're going to present this case to the Department of Justice for the death penalty, because that's what this carries. It carries a mandatory minimum of life. You'll never get out, ever, ever, and you may get lethal injection. Now, how we present this depends on the conversation we're having right now. We don't have to do that, but you got to give us a reason not to ask for it…What I can tell you is that a lot of the decisions that are made by a federal prosecutor, U.S. Attorney -- he listens to us. And if we don't talk just a little bit more here today, I've got no reason to call him and say, hey, man, let's not make that trip to Washington.
> …
> I mean, it – it—man, this right here, this conversation really is just keeping us from presenting this case for capital murder and the death penalty, because that's where we're going.

[DE 161-5 at 884].

> Middleton:

Here's the – here's the thing, man. He's getting – and I don't want you to mislead me something, all right? You know, when we tell you that there's a range of penalties, that's what the range of penalties – it's just like me telling you that when, you know, on average somebody gets, you know, a death sentence in the federal

system, it's like 15 to 18 months before it's carried out. It's not like 20 years in the

state where you're fighting all these appeals. Because the way it works, I mean, the

case is done before it ever starts.

*Id.* at 888-889.

Clopton:

Q: I'm not going to lie to you. You ain't going home tonight. I guess – honestly, I guess the question you need to ask yourself is are you ever going to go home? Are you going to go home in X amount of 24 years? Are you going to go home in this X amount of 25 years? Are you never going to go home? Are you going to die in prison or are you going to get a needle shoved up your arm and get killed? That's what you need to ask yourself. The ball is literally in your court.

A: Man. I don't want to die, man.

Q: Everybody in this room, me and you – everybody in this building knows that you know more than you're telling us.

A: But you trying to tell me that I need to say that I did this.

Q: Who's trying to tell you that?

A: I mean, I guess you all want me to say that I did this.

*Id.* at 923-924.

The United States relies on *Bays v. Warden Chillico the Correctional Inst.,* 807 Fed.App'x

481, 486 (6th Cir. 2020). In *Bays,* the detective informed the defendant that he was facing "a

possible death penalty case" and that "withholding the truth. . . could only hurt him and not benefit

him." *Id. a*t 486.  The Court in *Bays* held that it was not clear that the detective's statements

regarding the different penalties constituted an implied promise of leniency.  Yet Cater argues that

this case is distinguishable because Sanders did not just advise Cater of the worst-case scenario,

but went past that by stating "now, how we present this depends on the conversation we're having

right now. We don't have to do that, but you got to give us a reason not to ask for it." [DE 192 at 1310]. The Court agrees. Coerciveness turns on the issue of whether the threat could have been lawfully executed. *United States v. Johnson, 351 F.3d 254, 263* (6th Cir. 2003). Though Clopton testified he was consulting with members of the DEA on where Cater was ultimately going to be charged [DE 183 at 1097] and Sanders states that he was working with the U.S. Attorney's Office on the complaint [DE 183 at 1185], the statements that a capital sentence could be carried out in 15 to 18 months without the opportunity for appeal were incorrect. Further, Cater was interviewed on February 23, 2018 and the Department of Justice did not adopt the Addendum to the Federal Execution Protocol resuming capital punishment until July 25, 2019. [3]

The Court finds that the statements made by the law enforcement personnel to Cater went beyond merely promising to inform the prosecutor of cooperation (*United States v. Stokes*, 631 F.3d 802 (6th Cir. 2011)); or informing him that "cooperation helps" (*United States v. Wiley*, 132 Fed.App'x 635 (6th Cir. 2005)); explaining that the Sentencing Guidelines established a procedure for allowing the Government to move to reduce a sentence when substantial assistance is given (*United States v. Wrice*, 954 F.2d 406 (6th Cir. 1992); *United States v. Delaney*, 443 Fed.App'x 122 (6th Cir. 2011)). Agent Sanders very clearly told Cater that he and employees of the U.S. Attorney's office were going to go to Washington to present this case to the Department of Justice for the death penalty but that the decision turned on Cater's cooperation. He says "you got to give us a reason not to ask for it. . . And if we don't talk just a little bit more here today, I've got no reason to call him and say, hey, man, let's not make that trip to Washington." [DE 161-5 at 878-880]. The Court finds the police action was objectively coercive.

---

[3] https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse

Next in the *Mahan* factors, the Court looks to whether the coercion was sufficient to overbear defendant's will.  Based on Cater's bond report, he graduated from high school in 1994. He has no history of mental health treatment or substance abuse.  Though he was handcuffed, he was given access to bathroom facilities and provided water.  [DE 183 at 1083, 1144].  Cater is 42 years old.  [DE 161-4 at 743].  In *McCall v. Dutton*, 863 F.2d 454, 460 (6th Cir. 1988), the Court looked to defendant's education and found that defendant was a college graduate with graduate school experience which supported a finding that his will was not overborne.  *McCall*, 863 F.2d at 460.  Unlike *McCall*, Cater is not an graduate school educated man.  Further, in *Siler*, the Court found that the second factor supported suppression because the defendant was very focused on what the detective was promising him regarding leniency and that defendant made a point of calling the detective back into the interrogation room to ask details about the leniency.  *Siler*, 526 Fed. App'x at 576.  Similarly, Cater asked to speak to the detective again about the death penalty after Sanders, Middleton and Clopton left the room and the conversation upon the agents return revolved around what leniency was available to Cater.  [DE 161-5 at 915].  During the interrogation Cater expresses clear confusion:

> [Clopton]
>
> Q: Well, what did you –why did you want one of us to come back in here? What was the--
>
> A: Nothing. I just – I'm not understanding all this stuff, man, right now.
>
> Q: Well, what are your questions? I'll answer them the best I can.
>
> A: I mean, death penalty, all this stuff, man. You know, you all – I don't understand it, man. I don't understand.

[DE 161-5 at 916-917].

As a result, Court finds the coercion was sufficient to overbear Cater's will.

Lastly, the Court looks to whether the police misconduct was the crucial motivating factor in the defendant's decision to offer the statement. The officers testified during the suppression hearing that Cater was anxious.  [DE 183 at 1117-1118].  During Cater's conversation with his wife, after Middleton and Sanders make the above comments about the death penalty, Cater is completely focused on the death penalty [DE 161-5 at 899] and says: "Just get me some help, and everything else, I just got to try to get myself together because it's overwhelming right now. And I mean, I got to get myself together, but just please get me some help." *Id.* at 908.  The threat of the death penalty was the crucial motivating factor behind any statements made by Cater after Agent Sanders coercive statements.  *Id.* at 879.  *Compare Green v. Scully*, 850 F.2d at 903–04 (confession not suppressed because the defendant confessed because he was afraid he would harm others, not because of police misconduct).

Thus, the government has failed to show by a preponderance of the evidence that Cater's statements were voluntary and the totality of the circumstances show that the statements made during the second interrogation were, in fact, coerced.

## IV. <u>CONCLUSION</u>

Accordingly, for the reasons stated, and the Court being otherwise sufficiently advised, IT IS  ORDERED that:

1.  Cater's motion to suppress [DE 161] is GRANTED IN PART. Cater's statements pre-*Miranda* may be used for impeachment purposes, however they may not be used in the United States' case in chief.  The remainder of Cater's statements from the interrogation on February 23, 2018 shall be suppressed.

2.  The United States' unopposed motion to exceed the page limitation for its response [DE 188] is GRANTED.  LCrR. 47.1(e).

December 1, 2021

Rebecca Grady Jennings, District Judge
United States District Court